UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re:  D. ERIK VON KIEL, | : | Case No. 10-21364 |
| Debtor | : | Chapter 7 |
| ROBERTA A. DEANGELIS, | : | |
| UNITED STATES TRUSTEE | : | Adversary No. 10-2136 |
| Plaintiff | : | |
| v. | : | |
| D. ERIK VON KIEL, | : | |
| Defendant | : | |

# ORDER DENYING DEBTOR'S DISCHARGE

AND NOW, this 5th day of January, 2012, upon my review of the

facts and arguments advanced by the United States Trustee and Debtor, and upon

the blatant, wrongful attempt by Debtor to escape responsibility (through a

Chapter 7 discharge) for his financial obligations when he has every ability to pay

them, and upon the Memorandum Opinion Supporting Order Denying Debtor's

Discharge of even date herewith,

IT IS HEREBY ORDERED that judgment is hereby entered in favor

of the United States Trustee and against Debtor in this adversary proceeding.

IT IS FURTHER ORDERED that Debtor's discharge is hereby

DENIED.

BY THE COURT

RICHARD E. FEHLING
U.S. Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE:  D. ERIK VON KIEL, | : | Chapter 7 |
| Debtor | : | Bk. No. 10-21364REF |
| ROBERTA A. DEANGELIS, | : | |
| UNITED STATES TRUSTEE | : | Adversary No.  10-2136 |
| Plaintiff, | : | |
| v. | : | |
| D. ERIK VON KIEL, | : | |
| Defendant. | : | |

# MEMORANDUM OPINION SUPPORTING ORDER DENYING DEBTOR'S DISCHARGE

# I.  INTRODUCTION

Debtor earns compensation well in excess of $150,000 annually.[1]

Debtor earns such compensation, but he has declined and continues to decline to

take it and has assigned and continues to assign it to an apparent religious

organization that gave and gives back to him, as a gift, a substantial portion of that

compensation.  For ten years before filing his bankruptcy case, Debtor has been

evading taxes and shielding his assets and income from creditors.  Under the label

of a ministry, Debtor has avoided and evaded his obligation to report his income

---

[1] From January 1 to December 31, 2009, Debtor's compensation was $153,000 and from January 1 to April 30, 2010, Debtor's compensation was $62,000.  He claims to have received $0 compensation during that time.

and file tax returns. He has also kept his assets and income beyond the reach of his creditors, including the United States, to which is owed significant unpaid student loans and probable unpaid taxes. Electing a shield of poverty and maintaining some separation from his family, Debtor exercised complete control over substantial amounts of money by using tax identification numbers that were not his, opening bank accounts (that he controlled) in the names of different entities, and funneling income through a nominally religious entity – all to defraud tax authorities and frustrate his creditors. The United States Trustee ("UST") established at trial that Debtor is not an honest and unfortunate debtor deserving the fresh start afforded by the Bankruptcy Code. I will grant the request of the UST to deny Debtor's discharge in this Chapter 7 case. This Memorandum Opinion constitutes my findings of facts, my conclusions of law, and my discussion about Plaintiff's adversary proceeding seeking to have Debtor's discharge denied.[2] As I note below, in the Conclusion and in the accompanying Order, I find for the Plaintiff/UST and against the Defendant/Debtor.

---

[2] I found, in preparing this Memorandum Opinion, that the memorandum of law filed by the United States Trustee on September 30, 2011, correctly, carefully, and precisely mirrored my thoughts and findings from the hearings on both July 29 and August 8, 2011, in this adversary proceeding. This Memorandum Opinion draws very heavily from, and largely reiterates, the recitation of the facts and analysis of the law contained in the UST's memorandum, all of which I find exhaustive and persuasive.

Precisely the opposite, however, is Debtor's response brief, which Debtor prepared himself without the assistance of his counsel. It is an amalgamation of testimony of Debtor never presented at the hearings on this matter, and it contains no legal analysis.

# II. BACKGROUND

## A. Jurisdiction

This case constitutes an adversary proceeding objecting to Debtor's discharge pursuant to 11 U.S.C. §727(a)(2), (3), and (4). This case is therefore a core proceeding and I have jurisdiction and the power to consider this matter and to issue a final decision pursuant to 28 U.S.C. §157(b)(2)(J).

## B. Procedural And Factual Background

Debtor filed his Chapter 7 petition on May 6, 2010 (the "Petition Date"). He acknowledged that his primary purposes in filing this case were to stop garnishment proceedings against his salary by the United States on behalf of the Department of Health and Human Services ("HHS") and to obtain a discharge of the debt that he owes to the United States. The United States, on behalf of HHS, is a creditor in this case in an amount exceeding $187,000, arising from civil judgments entered against Debtor for defaulted Health Education Assistance Loans ("HEAL"). Judgments on the HHS claim were entered in Lehigh County Court of Common Pleas in 1999 and 2000. The judgments were registered, under Debtor's alias - D.O. Dennis W. Fluck, in the United States District Court for the Eastern District of Pennsylvania on September 19, 2002, at Misc. No. 02-mc-234,

-3-

Hon. Petrese B. Tucker, presiding.   On April 23, 2010, only two weeks before

Debtor filed this case, Judge Tucker rejected Debtor's attempt to challenge the

judgments and the garnishment efforts of the United States and ordered Debtor's

employer to pay 25% of Debtor's net earnings to the United States for his HEAL

loans.  This case constitutes Debtor's ill-concealed and back-door attempt to avoid

Judge Tucker's decision.

Debtor graduated from Philadelphia College of Osteopathic Medicine

with a medical degree in the mid 1980s.  He used the HEAL loans to pay for his

education and has continually practiced medicine since at least 1988.  Debtor lists

few assets on his Schedules filed in this case.  Debtor claims he has no actual or

beneficial interest in any real property, bank or other financial accounts, household

goods and furnishings, or other commonly owned, everyday items.

On his Schedule of Income, Debtor states that he is employed, and

has been employed for ten years, as a "Minister/M.D./D.O." with the International

Academy of Life ("IAL"), based in Orem, Utah.  He alleges that he receives no

salary or wages from his employer, but gets "gifts" of $12,787/month.  No taxes or

other deductions are taken from these monthly gifts.  Debtor has received these

gifts from IAL since 2005 or 2006; before then he received the gifts from a

predecessor entity, the International Academy of Lymphology.

-4-

From the monthly gifts from IAL, Debtor pays approximately $12,000 for so-called alimony, maintenance, and support for his wife and children. Debtor claims to have been separated from his wife for at least ten years. His support provides for his wife and nine children (both adults and minors), at least two of whom were born to his wife subsequent to their purported separation. Debtor makes the alleged support and maintenance payments to his wife and family voluntarily, not pursuant to any court order or written agreement between Debtor and his wife. Debtor pays all ordinary (and some extraordinary) living expenses for his wife and children. After making the payments to his wife and family, Debtor claims that he has less than $1,000 each month to pay his personal living expenses.

Debtor's unusual lifestyle and financial dealings began after his alleged spiritual awakening upon being charged with Medicare fraud in 1997. Although he was cleared of the charges, he claims this experience caused him to reevaluate his circumstances and make dramatic changes in his life. Among other changes, Debtor ended his practice of family medicine and any practice involving insurance billing. He now concentrates on non-traditional medical treatments, such as lymphology, and he works full time providing medical services to prison inmates. Debtor established one or more trusts into which he had attempted to

-5-

transfer ownership of the home he owned jointly with his wife.  In 2001, he joined

IAL, through which he took a vow of poverty.  He claims to have renounced any

interest in real or personal property as well as any current or future income,

granting his interests in all property and income to IAL.  IAL purports to be a

church, and Debtor claims he was ordained as a minister of IAL at or about the

time he executed his vow of poverty.[3]

   An additional component of this transformation was Debtor's grant of

powers of attorney to John Kusek and Robert macWray, giving both men

(particularly Mr. Kusek) full authority to handle all of Debtor's financial affairs.

According to Debtor, Mr. Kusek handled all of his finances other than writing

individual checks for the personal needs of Debtor and his family.  Debtor kept no

financial records from the time Mr. Kusek was given power of attorney (around

2000) until sometime shortly before Mr. Kusek's death in August 2010.

   Debtor's religious transformation was reawakened and his current

scheme of financial operations arose after the unpaid HEAL loan judgments were

entered against him in state court in 1999 and 2000, and upon the registration of

those state court judgments in the United States District Court in 2002.

---

[3] I note at this time that I accept that Debtor believes he has made a fundamental shift in his life. His problem, among others, is his utter, absolute, and ill-placed reliance on IAL for all matters financial and legal.  Its representatives tell him what to do and how to do it and he blindly does it.  This includes the purely legal advice and drafting of legal documents that IAL representatives provide for him.

Beginning in 1989, and continuing to the present, Debtor provides medical services to inmates at the Lehigh County Prison ("LCP"), where he holds the title of Medical Director. From 1989 to 2001, he performed his work as an independent contractor, unaffiliated with any corporate entity. Beginning in 2001 and continuing into 2004, he worked with Wexford Health Services as an independent contractor providing the same services for LCP. After a new company, PrimeCare Medical, Inc. ("PrimeCare"), obtained the contract to provide medical services to LCP, Debtor switched to PrimeCare. PrimeCare contracts with Lehigh and other counties throughout Pennsylvania to provide medical services at their county correctional facilities. In August 2004, Debtor entered into a new independent contractor agreement with PrimeCare to continue his work as Medical Director at LCP and other prisons. Beginning in early 2005, he became a full-time employee of PrimeCare, continuing to provide the identical work he had performed at LCP since 1989. PrimeCare has no contractual relationship with IAL; IAL is not a beneficiary of PrimeCare's services; IAL does not supervise or have anything to do with Debtor's work at LCP; and IAL exercises no control over Debtor's employment relationship with PrimeCare.

When Debtor began working as an independent contractor with PrimeCare, he completed and signed IRS Form W-9 for tax reporting. Debtor

failed to comply with the form's instructions directing him to place his social security number on the form. To the contrary, Debtor placed some other number (apparently a social security number for some other individual (the "Second SSN")) on the form. IAL personnel provided the Second SSN to Debtor and instructed him to use it.

When Debtor became a full time employee of PrimeCare, he received a salary with regular increases, fully paid family health benefits, life insurance, annual leave, a monthly car allowance (later changed to provide a company car), a gas credit card, and a monthly cell phone allowance. PrimeCare also added Debtor to its Medical Professional Liability Insurance policy and pays the annual premium for coverage under the policy. Nevertheless, Debtor reports zero income from PrimeCare on his bankruptcy schedules and to the Internal Revenue Service. Beginning in late 2007 and through the Petition Date, Debtor was given the title Assistant Corporate Medical Director.

PrimeCare assigns all of Debtor's duties and responsibilities to him; Debtor is obliged to carry out PrimeCare's policies and directives; Debtor is supervised by PrimeCare's Corporate Medical Director; PrimeCare requires Debtor to undergo annual performance reviews; and, at the end of each year, PrimeCare issues a W-2 to Debtor setting forth the amount of compensation paid

-8-

to him during the year.  None of the W-2s issued by PrimeCare to Debtor for 2007

through 2010 bear Debtor's social security number; to the contrary, they all show

the Second SSN.

Subsequent to registering the HEAL loan state court judgments in

federal court, the United States, on behalf of HHS, began collection efforts,

including the issuance of writs of garnishment to PrimeCare in 2006 through 2009.

Beginning at about the time of the 2006 garnishment proceedings, Debtor engaged

in a series of actions to keep his assets and income beyond the reach of the United

States and other creditors.  On June 1, 2006, Debtor signed a deed transferring

ownership of his home to his wife alone.  Debtor believed that he had previously

transferred his home to a trust, but later discovered a problem with the attempted

transfer.  Debtor also completed and signed two separate Employee Direct Deposit

Authorization Forms.  The first form, dated November 5, 2006, bears Debtor's

social security number, and directs PrimeCare to begin depositing his pay directly

into an account maintained by IAL Mgmt, LLC In Trust for the Order of the IAL

at the Family First Federal Credit Union in Orem, Utah (the "IAL Mgmt

Account").   Four months later he completed and signed the second Direct Deposit

Authorization Form directing PrimeCare to continue depositing his pay into the

IAL Mgmt Account.  Instead of using his own social security number, Debtor

placed the Second SSN on the second form.  Again, these changes occurred at

about the time garnishment proceedings in federal court were pending.

   In December 2006, Debtor also opened business checking and

investment accounts at Bank of America in the name of TLM, True Life

Ministries, Inc. ("TLM").  Debtor signed the account signature card and other

forms as a "Trustee" of TLM, and used yet a third tax identification number.

Debtor testified that he does not remember being named a trustee of TLM, nor

does he know why this was done.  This was a frequent and pervasive characteristic

of Debtor's testimony and conduct throughout this entire case.  Debtor blindly

followed the direction and advice of IAL, its representatives, and Mr. Kusek

regarding all things legal and financial.  He made no effort to ascertain the

legitimacy of anything that he did at their direction.  He simply followed their

orders and direction on how he should conduct his affairs with no evinced concern

for its legality or propriety.

   Other than being permitted to open and use the TLM accounts,

Debtor stated he had no affiliation with TLM.  Both TLM and Debtor's name are

printed on the deposit slips and checks used with the TLM accounts.  Debtor

testified his name was on the checks to enable him to write checks on the TLM

accounts.  The mailing address for the TLM accounts is not IAL's, TLM's, or

-10-

Kusek's address, but is Debtor's personal address for his mail.   The TLM

accounts were under Debtor's sole and exclusive control through and after the

Petition Date; Debtor is the only person to have signature authority on the TLM

accounts; and Debtor is the only person to have custody and control of the debit

cards linked to the TLM accounts.   Debtor used the TLM accounts exclusively to

receive the purported gifts from IAL and to pay the day-to-day expenses of

himself and his family.

In the beginning of July 2007, shortly after Debtor opened the TLM

accounts and PrimeCare began depositing Debtor's pay directly into the IAL

Mgmt account, the IAL began regularly wiring money into the TLM accounts.

Most of the wire transfers were in amounts similar to the paychecks Debtor would

have received from PrimeCare and the wire transfers were made at or about the

time that each payroll check was issued by PrimeCare.   The amount wired into the

TLM accounts was determined by IAL officials in consultation with Mr. Kusek,

and were based on Debtor's family, personal, and ministry needs each month.   Mr.

Kusek prepared monthly expense requests and Debtor played no part in

determining the amounts requested.   Debtor did not ask for and did not keep

copies of the expense requests.   Although Mr. Kusek was neither affiliated with

IAL nor subject to supervision by its officials, Debtor granted Mr. Kusek a power

of attorney.  The power of attorney allowed Mr. Kusek to oversee Debtor's financial activities, including the TLM accounts, allegedly to ensure that he acted responsibly in requesting funds.   Mr. Kusek's oversight activities apparently decreased over time.

Notwithstanding PrimeCare's (1) issuance of the W-2s to Debtor each year and (2) payment of money to IAL in excess of $150,000/year, Debtor testified that he receives no income for the work he performs for PrimeCare.  Instead, he claims that all wages or salary paid for the work he performed belong to IAL. Work he performed after 2001 was performed voluntarily in his capacity as a minister and medical missionary of IAL, pursuant to specific directive of the church.  All monies paid by PrimeCare were deposited directly into an IAL church related account because, Debtor claims, those monies were church property. PrimeCare, he says, is merely the vehicle he uses to conduct his ministerial and missionary activities in the various prisons.   Because Debtor claimed to have zero income, therefore, he paid no taxes, notwithstanding his receipt of tens of thousands of dollars on a regular basis.

Despite Debtor's scheme to evade taxes and retain the full benefit of income and assets beyond the reach of the United States, the United States successfully garnished Debtor's income in late 2009 into early 2010.  Again,

-12-

Judge Tucker's final order against Debtor was on April 23, 2010.  In response,

Debtor commenced the instant bankruptcy case to stop the garnishment and once

again frustrate and avoid the legitimate and legal collection efforts of the United

States.

# III.  LEGAL CONCLUSIONS

## A.  Debtor Is Engaged In A Fraudulent Scheme To Evade Taxes And Frustrate His Creditors

The linchpin of Debtor's scheme is his assertion that all of his income and assets belong to the church.  This assertion also underlies both the disclosures he made (and those he did not make) in his bankruptcy case and his request for a discharge.  By presenting himself as a poverty-stricken minister, burdened by debts he claims he is unable to pay, Debtor claims to be an honest but unfortunate debtor who deserves the fresh start afforded by the Bankruptcy Code.   I find little honest or unfortunate[4] about Debtor who, although unquestionably able to pay his obligations, chooses not to do so.  Local Loan Co. v. Hunt, 292 U.S. 234, 244 (1934)(bankruptcy is for the "honest but unfortunate debtor.").  See also, Brown v. Felsen, 442 U.S. 127, 128 (1979)("By seeking discharge, however, respondent placed the rectitude of his prior dealings squarely in issue, for, as the Court has noted, the Act limits that opportunity to the 'honest but unfortunate debtor.'")(citation omitted).

Debtor is engaged in (1) a tax-evading assignment of his income and

---

[4] As noted above, Debtor's blind acquiescence and adherence to whatever he was told by IAL, its representatives, and Mr. Kusek is his downfall.  Debtor acts terribly naive and ostrich-like about his finances, loans, charities, and taxes (particularly for someone with an advanced degree).  Nevertheless, that approach to his affairs removes him from the realm of honest but unfortunate debtors.

-14-

(2) alter-ego fraud under the guise of ministerial and missionary efforts for a purported church. Pursuant to the scheme, Debtor, as a minister of IAL, is subject to a vow of poverty and claims he has no income or assets and need not file federal income tax returns, keep financial records, or repay his loans.

He also claims that any real or personal property and any income he ultimately receives are owned and controlled by the church and thus beyond the reach of his creditors. Allegedly acting pursuant to church directives, Debtor is a voluntary worker who generates income solely for and on behalf of the "church," IAL. He then relies on IAL for considerable financial support for himself and his separated family by claiming that the amount of gifts he receives in any month is determined solely by the church, based in some undisclosed manner on his anticipated ministry and support needs for the month. Attempting to further validate this arrangement, Debtor even claims that he plays little or no role in determining his ministry and support needs. All of his expenditures, he claims, are subject to oversight of and control by IAL officials or someone outside the church (Mr. Kusek) to whom such authority was granted by IAL officials.

In substance, Debtor's ministry activities and receipt of gifts from IAL are simply a mechanism that enables him to shield his assets and evade both federal income taxes and obligations owed to the United States and other creditors.

-15-

Debtor is in fact a salaried employee of PrimeCare who has falsely and

fraudulently assigned his income to IAL.  As either a doctor or a minister he

engages in the same income-generating activity he did prior to his vow of poverty.

The restrictions that the church ostensibly places on his income-generating

activities as a minister are wholly illusory.  In sum, according to this scheme, one

executes a vow of poverty, pledges allegiance to a church, assigns his income and

assets to the church, receives "gifts" from the church, and refuses to pay taxes and

other financial obligations — all without changing his lifestyle, familial support,

or line of work.

While the perceived benefits of this arrangement appear significant,

they must fall flat.  Similar schemes and arrangements to evade taxes have

repeatedly, routinely, and properly been rejected for years by the Internal Revenue

Service and federal courts.  Although Debtor' IAL scheme constitutes a detailed,

elaborate effort to enable its ministers to evade tax and other financial obligations,

the scheme constitutes an impermissible, anticipatory assignment of income.

The legal precedents are legion and clear.  Under the anticipatory

assignment of income doctrine, "gains should be taxed to 'those who earned

them,' a maxim [the Supreme Court has] called 'the first principle of income

taxation.'"  Comm'r v. Banks, 543 U.S. 426, 433 - 34 (2005)(citing Comm'r v.

-16-

Culbertson, 337 U.S. 733, 739 - 40 (1949); Lucas v. Earl, 281 U.S. 111, 114
(1930)).  A taxpayer is not relieved of his obligation to pay income tax on income
he earns when he transfers it or assigns it to another person or entity.  United
States v. Basye, 410 U.S. 441, 449 - 51 (1973).  Regarding earnings purportedly
subject to a vow of poverty, "if a member of a religious order earns income in his
individual capacity and gives the money to the order pursuant to his vow of
poverty, that sum is income to him and is subject to federal income tax."  Page v.
Comm'r, 823 F.2d 1263, 1270 (8th Cir. 1987)(citing Schuster v. Comm'r, 800
F.2d 672 (7th Cir. 1986); Fogarty v. United States, 780 F.2d 1005 (Fed. Cir.
1986)).

Efforts to avoid payment of income taxes by executing vows of
poverty are not new.  As the Court of Appeals for the Seventh Circuit observed a
quarter century ago:  "Every year, with renewed vigor, many citizens seek
sanctuary in the free exercise clause of the first amendment.  They desire salvation
not from sin or from temptation, however, but from the most earthly of moral
duties  –  income taxes."  Mone v. Comm'r, 774 F.2d 570, 571 (2d Cir. 1985).
All eight Courts of Appeal (including the Third Circuit) to have addressed the
issue are in agreement:  Attempts to avoid personal tax liability based on vows of
poverty without proof that some agency relationship exists between the entity

-17-

providing the wages and the church or religious order requiring the vow of poverty

are simply unavailing.  See, e.g., Pollard v. Comm'r, 786 F.2d 1063, 1064 (11th

Cir. 1986)("This is another in a long list of suits . . . against individuals who

attempt to shield themselves from income tax by taking sham vows of poverty and

purportedly turning over their income to so-called religious orders."); Page, 823

F.2d 1263; Schuster, 800 F.2d 672; Fogarty, 780 F.2d 1005; Mone, 774 F.2d 570;

Stephenson v. Comm'r, 79 T.C. 995 (1982), aff'd, 748 F.2d 331 (6th Cir. 1984);

McGahen v. Comm'r, 76 T.C. 468 (1981), aff'd without opinion, 720 F.2d 664 (3d

Cir. 1983); Lynch v. Comm'r, 41 T.C.M. (CCH) 204 (1980), aff'd by unpublished

order (1st Cir. June 2, 1981).

In Fogarty, the court found a Jesuit priest individually responsible

for income taxes on wages paid for his service as an assistant professor at the

University of Virginia's Department of Religious Studies.  780 F.2d at 1011 - 13.

The priest was "bound to [his] Order by vows of chastity, poverty, and obedience"

and "his entire salary went to the Order and the Order provided him living

expenses."  Id. at 1006 - 7.  Nevertheless, the court affirmed the lower court's

conclusion that the priest had earned the income in his individual capacity, not as

an agent of the order.  Id. at 1013.

The court reached a similar conclusion in Schuster, which involved a

Roman Catholic nun employed by National Health Services Corp.   800 F.2d at

676 - 78.  The court observed, among other things, that "pursuant to Schuster's

vow of obedience, the Order retained authority to control Schuster's daily

routine," but "the Order did not in fact exercise such day-to-day control."  Id. at

678.  In Pollard, the court explained that "the [church's] religious bona fides are

irrelevant – it is the purported assignment of income here that is a 'sham,' and for

tax rather than religious reasons."  786 F.2d at 1066.

      Receiving direction to use secular occupations as agents of the church

or order does not create the required agency relationship.  Page, 823 F.2d at 1265;

Fogarty, 780 F.2d at 1012; Mone, 774 F.2d at 573 - 74.  Nor is it relevant that the

individual must apply to the church or order for allowance to maintain the

expenses of their individual ministry/order.  Pollard, 786 F.2d at 1064 - 65;

Fogarty, 780 F.2d at 1012.  Such attempts to avoid personal tax liability are

unavailing even if the taxpayer causes wages or earnings to be assigned directly to

a third party.  See, e.g., Wheeler v. United States, 768 F.2d 1333, 1335 - 36 (Fed.

Cir. 1985).

      To prove that wages or earnings were the income of the church or

religious order rather than the individual, the majority of courts require the

existence of a direct contractual agency agreement between the religious order and

the secular employer.  See, e.g., Page, 823 F.2d at 1270 - 71; Pollard, 786 F.2d at

1065 - 66; Mone, 774 F.2d 573 - 74.  The minority rule applies a somewhat more

flexible approach, requiring an examination of such factors as (1) whether the

religious order had any direct impact into the hiring of the employee and (2)

whether the religious order has any ability to direct the duties of the employee.

See Schuster, 800 F.2d at 677 - 79; Fogarty, 780 F.2d at 1012 - 13.

Regardless which standard I apply, however, Debtor has failed to

establish the existence of any agency relationship whatsoever between PrimeCare

and IAL, to which he gave his vow of poverty.  Notwithstanding the vow of

poverty, however, the income Debtor earns (well over $100,000/year) is simply

funneled through IAL and then deposited into Debtor's TLM accounts.   Debtor

pays his family's and his own living expenses in exactly the same fashion as any

individual not bound by a vow of poverty, including through the use of a debit

card.  Debtor has shown no effective restriction on his day-to-day purchase of

whatever he wants.  Put simply, in form he took a vow of poverty, but in substance

he continues to earn income from his employment and use that income to pay

numerous expenses for his separated family and for himself.

Debtor's claim that he is bound by a church directive to provide

medical services to inmates at LCP and other prisons and is thus volunteering his

services as an agent of IAL is frankly insulting.  The only church directive Debtor

offered is too broad to constitute any real restriction over his ministry activities

and required him to engage in precisely the same income-generating medical work

he performed before being ordained a minister.   IAL neither exercises control

over Debtor's work nor influences the operations, policies, or procedures of

PrimeCare as they relate to Debtor's employment and compensation.

I.R.S. Publication 517 provides information to members of the

clergy and other religious workers about taxes and social security.  Any

interpretation that Debtor might impart to Publication 517 to support his view that

the salary paid by PrimeCare for the work he performs is not his income is also

unavailing.  Publication 517 includes the following distinction between truly tax-

exempt ministers and those, like Debtor, who provide income-generating services

to a third party and simply attempt to evade paying taxes:

> Example.  Pat Brown and Chris Green are members of a
> religious order and have taken a vow of poverty.  They
> renounce all claims to their earnings.  The earnings belong to
> the order.
>
> Pat is a licensed attorney.  The superiors of the order instructed
> her to get a job with a law firm.  Pat joined the law firm as an
> employee and, as she requested, the firm made salary payments
> directly to the order.  Chris is a secretary.  The superiors
> of the order instructed him to accept a job with the
> business office of the church that supervises the order.
> Chris took the job and gave all his earnings to the order.

-21-

> Pat's services are not services required by the order. Her
> earnings are subject to social security and Medicare tax
> under FICA and to federal income tax. Chris' services
> are considered duties required by the order. He is acting
> as an agent of the order and not as an employee of a third
> party. He does not include the earnings in gross income,
> and they are not subject to income tax withholding,
> social security and Medicare tax, or SE tax.

I.R.S. Publication 517: Social Security and Other Information for Members of the

Clergy and Religious Workers.

In sum, Debtor cannot avoid his financial responsibilities by simply

executing the vow of poverty and assigning his income to IAL or some trust, even

if it was established for some religious purpose. The vow of poverty is not a silver

bullet against paying his taxes and other financial obligations. No law supports

Debtor's notion that his vow of poverty can reduce or eliminate his income and

thus avoid his obligation to pay his taxes and other financial obligations.

## B. Debtor's Discharge Is Denied For Failing To Keep And Preserve Recorded Information From Which His Financial Condition Can Be Ascertained

A discharge in bankruptcy is a "privilege, not a right" that must be

earned and is reserved for an honest debtor who has dealt fairly with the court and

his creditors. Wachovia Bank, N.A. v. Spitko, (In re Spitko), 357 B.R. 272, 298

(Bankr. E.D. Pa. 2006)(citing In re Juzwiak, 89 F.3d 424, 427 (7th Cir. 1996)).

-22-

Upon filing for bankruptcy, the debtor's obligation is to be entirely forthright in providing financial information. Sonders v. Mezvinsky (In re Mezvinsky), 265 B.R. 681, 690 (Bankr. E.D. Pa. 2001). "No one is obligated to recreate the Debtor's financial affairs; that task is his alone." Goldberg v. Lawrence (In re Lawrence), 227 B.R. 907, 915 (Bankr. S.D. Fla. 1998). The Bankruptcy Code makes complete financial disclosure a condition precedent to the privilege of a discharge. Id. (citing Broad Nat'l Bank v. Kadison, 26 B.R. 1015, 1018 (D.N.J. 1983)).

> Section 727(a)(3) of the Bankruptcy Code provides:
>
> (a) The court shall grant a debtor a discharge, unless –
> ***
> (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all the circumstances of the case.

11 U.S.C. §727(a)(3). "As a precondition to the bankruptcy discharge, §727(a)(3) requires a debtor to produce enough information for creditors to determine and track the debtor's financial and business transactions for a reasonable time prior to the bankruptcy." Gray v. Jackson (In re Jackson), 453 B.R. 789, 796 (Bankr. E.D. Pa. 2011)(citing Juzwiak, 89 F.3d at 427).

-23-

As the Third Circuit stated:  "The purpose of section 727(a)(3) is to give creditors and the bankruptcy court complete and accurate information concerning the status of the debtor's affairs and to test the completeness of the disclosure requisite to a discharge." Meridian Bank v. Alten, 958 F.2d 1226, 1230 (3d Cir. 1992).

> [R]ecords must " 'sufficiently identify the transactions [so] that intelligent inquiry can be made of them.' The test is whether 'there [is] available written evidence made and preserved from which the present financial condition of the bankrupt, and his business transactions for a reasonable period in the past may be ascertained.' " In re Decker, 595 F.2d 185, 187 (3d Cir. 1979)(citations omitted). Thus, in order to invoke the protection of the bankruptcy court, the debtor must maintain and preserve adequate records.

Id. at 1230 - 31.

To prevail under section 727(a)(3), the party opposing the grant of a discharge must show that (1) the debtor failed to maintain and preserve adequate records and (2) the failure to maintain makes it impossible to ascertain the debtor's financial condition and material business transactions. Id. at 1232. The UST has the initial burden of showing that Debtor's records are inadequate to ascertain Debtor's financial condition. Id. Because the UST met this initial burden, however, the burden shifted to Debtor to provide adequate justification for his failure to keep or preserve records. Id. at 1232 - 33.

As noted briefly above, a consistent refrain throughout the trial was

-24-

Debtor's failure to prepare, collect, and preserve records.  Among other things,

Debtor did not keep: (1) Records of the gifts he received from IAL; (2) records of

his expenditures from the TLM accounts; (3) check stubs or registers; or (4)

records of the source of the deposits made into the TLM accounts he controls.

Debtor is therefore unable to identify the source and nature of certain deposits and

expenses.  Furthermore, Debtor did not prepare, file, or keep tax returns and he did

not bother to look at, let alone maintain or preserve, financial information he

received (such as the W-2s issued by PrimeCare) each year.   Clearly, Debtor did

not and does not bother himself with reviewing, preparing, maintaining, or

preserving any records of his financial dealings.

The only records Debtor was able to identify at trial were a couple

months of check stubs that he had taken to his attorney's office to complete his

initial bankruptcy papers.  When asked why even those records had not been

produced before trial as requested by the United States Trustee, Debtor stated that

once he finished using them, they were turned over to IAL and he no longer had

access to them.

The most recent tax return that Debtor remembers filing was in

2000.  Otherwise, he does not know the status of tax returns for any subsequent

year.  If returns were filed, they were prepared and filed by Mr. Kusek, but Debtor

does not know even that.

While these responses are certainly consistent with Debtor's overall

effort to shield income from taxing authorities and his creditors, it leaves the

Court, his creditors, the trustee, and any other party in interest with no ability to

ascertain Debtor's financial condition or to test the veracity of the disclosures on

his bankruptcy filings.  So important is the concept of disclosure that it requires no

showing of subjective intention to defraud or hinder creditors.  Mezvinsky, 265

B.R. at 690.

In the trial, the UST put into evidence a handful of documents

obtained pre-trial.  The availability of TLM account statements and cancelled

checks from the TLM accounts is woefully insufficient to satisfy Debtor's

obligation to have maintained and preserved adequate records.  The court in

Jackson addressed the availability to debtor of bank statements and checks in an

action brought under Section 727(a)(3), declaring: Although total deposits and

withdrawals may be ascertained from the bank statements, simply providing such

information is insufficient.  Presaging much of what occurred in this case, Judge

Frank noted in Jackson:

> There are tens of thousands of dollars of deposits and withdrawals,
> including cash transactions by "ATM," each month . . . without any
> description or supporting documentation–they therefore, cannot be
> attributed to any particular . . . transaction or purpose.  See Juzwiak,

-26-

> 89 F.3d at 428 (holding that checking account ledgers, cancelled
> checks, bank statements, and tax returns do not enable creditors to
> track financial dealings with any degree of accuracy, as these types of
> records do not disclose the sources of funds or substantiate expenses).

453 B.R. at 800. "Providing the court with a stack of cancelled checks and deposit account statements simply does not meet their burden under §727; it does not give [a creditor] sufficient information to trace their financial history or to reconstruct their transactions." Union Planters Bank, N.A. v. Connors, 283 F.3d 896, 900 (7th Cir. 2002).

As in Jackson, Debtor's TLM account statements show hundreds of thousands of dollars were deposited into the TLM accounts and were then taken or paid out by Debtor. The actual source of many of the deposits and the purpose for most of the expenditures, however, cannot be determined from the statements alone. Moreover, the statements show tens of thousands of dollars in ATM cash transactions and counter withdrawals each year with no description of the purpose for the withdrawals or the disposition of the monies being withdrawn.

Given Debtor's insistence at trial that he was answerable to a number of persons for expenditures made from the TLM accounts, I expected that some form of records had been prepared and maintained to satisfy IAL personnel's concern about the use of the funds it was depositing into the TLM accounts. Instead, Debtor failed to produce or offer any such records.

-27-

Debtor's attempt to hide behind the powers of attorney granted to

Mr. Kusek and Mr. macWray[5] and any other alleged oversight by church officials

is not acceptable. Debtor had sole access to the funds in the TLM accounts, had

sole check-writing authority, had sole custody of the only debit cards issued on the

TLM accounts, and was solely responsible for making disbursements from the

TLM accounts. Regardless who owned the monies deposited into the TLM

accounts, once deposited, the funds were clearly available to and used solely by

Debtor. His maintenance of and exercise of control over the TLM accounts

required him to account for the flow of funds to satisfy the requirements of Section

727(a)(3). See Peterson v. Scott (In re Scott), 172 F.3d 959, 969 - 70 (7th Cir.

1999). Section 727 "places an affirmative duty on the debtor to create books and

records accurately documenting his business affairs." Id. at 969. See also Cadle

Company v. Jacobowitz (In re Jacobowitz), 296 B.R. 666, 671 - 73 (Bankr.

S.D.N.Y. 2003)(even an unsophisticated debtor with simple financial affairs must

maintain a bare minimum of books and records from which his financial

transactions can be ascertained). Vague, indefinite explanations of expenditures

as living expenses, unsupported by documentation, is unsatisfactory. Mezvinsky,

---

[5] Mr. macWray (who is not an attorney) provided Debtor with substantial legal information, advice, support, and drafting. See, e.g., Offer in Settlement, filed by Robert:Wray [sic] on January 3, 2012. Document Number 63 on the docket of von Kiel v. Dept. Health & Human Serv., (In re von Kiel), Adv. Proc. No. 10-2022 (Bankr. E.D. Pa.).

265 B.R. at 690.

Debtor, a graduate of medical school and a practicing physician for over twenty years, may be naive, but he is not wholly unsophisticated. His financial affairs may be complex, but that complexity is a direct result of his participation with IAL and the others in the scheme to evade taxes and his creditors. He chose not to prepare, keep, and preserve financial records as part of that scheme, and I will not now reward him for doing so by allowing him to receive the discharge he seeks.

## C.  Debtor's Discharge Is Denied For Intentionally Transferring And Concealing Assets With Intent To Hinder, Delay, Or Defraud

Section 727(a)(2)(A) provides that a court shall grant the debtor a discharge unless "the debtor, with intent to hinder, delay or defraud a creditor or an officer of the estate . . . has transferred . . . or concealed . . . property of the debtor, within one year before the date of the filing of the petition."  11 U.S.C. §727(a)(2)(A).  "The purpose of  §727(a)(2)(A) is 'to deny a discharge to a debtor who attempts to prevent the collection of his debts by concealing or disposing of assets.'  In re Ingle, 70 B.R. 979, 983 (Bankr. E.D.N.C. 1987)."  Giansante & Cobb, LLC v. Singh (In re Singh), 433 B.R. 139, 160 (Bankr. E.D. Pa. 2010).  To prevail under Section 727(a)(2)(A), UST must show:  "(1) [T]hat the act

complained of was done at a time subsequent to one year before the filing of the

petition or after the date of the filing of the petition; (2) with intent to hinder,

delay, or defraud a creditor of the property under the Bankruptcy Code; (3) that the

act was that of the debtor or his duly authorized agent; and (4) that the act

consisted of transferring, removing, destroying or concealing any of the debtor's

property." Id.

For over ten years, Debtor has hidden assets and income from his

creditors, particularly the United States.  More specifically, in response to efforts

of the United States to garnish income that Debtor earned from PrimeCare, Debtor

transferred his compensation to IAL and had his income directly deposited into

IAL's account.   The funds would then shift from the IAL Mgmt Account to the

TLM accounts that Debtor had opened specifically to receive those funds.  Thus,

Debtor closed the circle and provided himself with complete access to most or all

of his tax-free income.  To further disguise his receipt of income and the TLM

accounts, Debtor utilized the Second SSN and at least one other tax identification

number belonging to other individuals or entities, further obscuring his receipt of

income and his maintenance and control of the TLM accounts, to keep them

undetected by the United States or other creditors.

" 'Concealment' is defined as preventing the discovery of,

-30-

fraudulently transferring, or withholding knowledge or information required by law to be made known." JRC Lumber Corp. v. Corona (In re Corona), No. 08-15924DHS, Adv. No. 08-1712DHS, 2010 WL 1382122, at *13 (D.N.J. April 5, 2010). "What is critical under the concealment provision of §727(a) is whether there is a concealment of property, not whether there is concealment of a transfer. Rosen v. Bezner, 996 F.2d 1527, 1532 (3d Cir. 1993). Thus, to prove concealment, a showing that the debtor retained an interest in the transferred property is required." Id. In the case before me, after Debtor's income was transferred to IAL, funds were returned to him through IAL's deposits into the TLM accounts. The TLM accounts were not opened or maintained in Debtor's name, but Debtor had sole and exclusive control over, and unlimited access to, them and he regularly withdrew funds for his family's and his personal benefit. These transfers and Debtor's concealment thereof occurred each and every pay period through the Petition Date.

Because a debtor is unlikely to admit that his or her fraudulent acts were undertaken with an intent to hinder, delay or defraud, intent may be inferred using circumstantial evidence or inferences drawn from a course of conduct. Corona, 2010 WL 1382122 at *13 (citations omitted):

> Courts have also established "badges of fraud," the existence of which indicate fraudulent intent. Such "badges" include: (1) a close

-31-

relationship between a transferor and transferee; (2) a transfer in
anticipation of a pending lawsuit; (3) a transferor/debtor who was
insolvent or in poor financial condition at the time of the transfer; (4)
the transfer of all or substantially all of the debtor's property; (5) a
transfer that so completely depletes the debtor's assets that the
creditor was hindered or delayed in recovering any part of the
judgment; and (6) the shifting of assets by the debtor to a corporation
wholly controlled by him.

Id. (citing Salomon v. Kaiser (In re Kaiser), 722 F.2d 1574, 1583 (2d Cir.

1983))(also citing Holber v. Jacobs (In re Jacobs), 381 B.R. 147, 164 (Bankr. E.D.

Pa. 2008).

I find several badges of fraud in this case, each of which demonstrates

that Debtor possessed the unqualified intent to hinder, delay, or defraud his

creditors. First, Debtor and both IAL and TLM had and have a close relationship

(Debtor was purportedly a minister with IAL, and TLM allowed him to open and

use the TLM accounts in its name). Second, the mechanism for the transfer of

income was done throughout the time in which the United States was attempting

to collect its judgments by garnishment and otherwise. Third, by engaging in the

transfer of income, Debtor presented the appearance of possessing no assets or

income that might be used to satisfy his debts, while in reality he continued to

receive a substantial income, which he spent at will to the detriment of his

creditors. Also along these lines, each voluntary transfer of Debtor's salary,

earned through his employment, made him insolvent and in worse financial health.

-32-

Fourth, Debtor transferred all of his income through this scheme, not merely a substantial portion of his income.  Fifth, by transferring his income he hindered and delayed the United States from collecting on its judgments against him.  Finally, the scheme through which he transferred his income resulted in at least a substantial amount of it being available to him in the TLM accounts, which he alone controlled.   The continuing nature of the fraudulent transfers over ten years makes the scheme that much more pernicious.   For these reasons, Debtor's request for a discharge will be denied.

## D.  Debtor's Discharge Is Denied For Making False Oaths Or Accounts In Connection With His Bankruptcy Case

A discharge may also be denied under Section 727(a)(4) if a debtor knowingly and fraudulently makes a false oath or account in or in connection with a bankruptcy case.  11 U.S.C. §727(a)(4).  "Section 727(a)(4)(A) is designed to ensure that the debtor puts dependable information in the hands of those interested in the administration of the bankruptcy estate without the need for the trustee or a party in interest to engage in costly, exhaustive investigations to ferret out the truth concerning the Debtor's financial condition."  Strominger v. Giquinto (In re Giquinto), 388 B.R. 152, 178 (Bankr. E.D. Pa. 2008).  Section 727(a)(4) applies not only to false statements made under sworn oath but also to unsworn declarations under penalty of perjury such as those made by Debtor on the

-33-

Schedules of Assets and Liabilities and the Statement of Financial Affairs

("SOFA"). Id. Moreover, for purposes of Section 727(a)(4), "a debtor is required

to disclose beneficial interests in property in addition to direct ownership rights."

Spitko, 357 B.R. at 313.

To prevail under Section 727(a)(4)(A), the objector must prove by a

preponderance of the evidence that (1) the debtor made a false oath or statement,

(2) the debtor knew the statement was false, (3) the debtor made the statement

with the intent to deceive, and (4) the statement was material to the bankruptcy

case. Giquinto, 388 B.R. at 178. UST proved by a preponderance of the evidence

that Debtor made numerous false oaths or statements.

As stated above, the evidence at trial clearly established that Debtor

exercised sole control of the TLM accounts as of the Petition Date and for several

years before filing. The TLM accounts were the only bank accounts Debtor used

from December 2006 through the Petition Date to receive deposits from IAL and

others and pay expenses for his family and himself. The TLM accounts were

opened for those specific purposes. Debtor was the sole signatory on the TLM

accounts, had sole possession of its debit card, and had the monthly statements for

the TLM accounts mailed directly to himself. The statements for the TLM

checking account show that on the Petition Date, several thousand dollars had

-34-

been on deposit in that account. Notwithstanding Debtor's clear exercise of total control and actual use of the TLM accounts as his own, he failed to list any actual or beneficial interest in the several thousands of dollars in the TLM accounts on his Schedules.

As of the Petition Date, Debtor was employed as the Assistant Corporate Medical Director by PrimeCare and received a salary for the work he performed at the LCP. PrimeCare had issued W-2s to Debtor showing the amount of compensation paid to him for 2007 through 2009. PrimeCare's Director of Finance also testified that PrimeCare provided its employees, including Debtor, with information regarding their compensation each pay period. Notwithstanding the existence of this information, Debtor failed to disclose both his employment by PrimeCare on Schedule I and the amount of income paid to him by PrimeCare during the year he commenced his bankruptcy case as well as the two prior years on Schedule I and in his SOFA.

Debtor answered question number 1 of his SOFA by listing amounts he allegedly received as gifts from IAL during 2009 and 2010 through the Petition Date. Debtor thereby evidenced his recognition that he was obliged to disclose the gifts as income for purposes of the disclosure requirements under the Bankruptcy Code. But the amounts of the gifts disclosed by Debtor ($153,000 for 2009 and

$62,000 for the first third of 2010) were materially less than the actual amounts

deposited into the TLM accounts during the relevant time periods.  The total

amount deposited by IAL into the TLM checking account during 2009 exceeded

$175,000, and the amount it deposited in 2010 through the Petition Date exceeded

$70,000.  Debtor had falsely reported his IAL "gift" income.

Question 3 of the SOFA required Debtor to disclose payments made

to creditors during the 90 days preceding the commencement of his bankruptcy.

Debtor stated  "None."  The TLM account statements, however, show payments to

at least two creditors, American General Finance Company and Citi Card during

each of the three months preceding the commencement of his case.  Debtor had

made a false oath or statement about paying his creditors.

A false oath or statement is made knowingly if the statement is (1)

known by the debtor to be false, (2) made without belief in its truth, or (3) made

with reckless disregard for the truth.  Spitko, 357 B.R. at 313.  "[M]ultiple

inaccuracies or falsehoods may rise to the level of reckless indifference to the

truth, which is the functional equivalent of intent to deceive."  Jordan v. Bren (In

re Bren), 303 B.R. 610, 614 (BAP 8th Cir. 2004) rev'd in part on other grounds,

122 Fed. Appx. 285 (8th Cir. 2005).  In addition to the badges of fraud discussed

above, the number of false oaths and statements on Debtor's bankruptcy papers

-36-

evidence more than mere inadvertence or mistake.  Debtor specifically chose what

he would and would not disclose.  To the extent that documents that could have

been available to him might verify or contradict the information on his Schedules

and SOFA, Debtor chose not to refer to them.  To the contrary, Debtor continued

the ten-year-long pattern of willing ignorance and indifference to his financial

affairs and condition that he exhibited prior to filing his Petition.

Finally, each of the false oaths and statements relate directly to

Debtor's financial affairs and transactions.  Even assuming no assets would be

available to administer for the benefit of creditors, disclosure of the source, nature,

and amount of Debtor's income, as well as the disposition of that income, are

required by the Bankruptcy Code.  Mezvinsky, 265 B.R. at p. 690.  Debtor's

income is clearly a factor that bears on his ability to satisfy his debts and his

eligibility for the bankruptcy relief he seeks.  His false oaths and statements about

his income, therefore, are material to Debtor's bankruptcy case.  United States

Trustee v. Zimmerman (In re Zimmerman), 320 B.R. 800, 808 (Bankr. M.D. Pa.

2005).  " '[T]here is little that will prove to be immaterial for purposes of required

disclosure if it aids in understanding the debtor's financial affairs and

transactions.' In re Coombs, 193 B.R. 557, 567 (Bankr. S.D. Cal. 1996)." Id.

Based on the above, I find as a fact and conclude as a matter of law, upon a

-37-

preponderance of the evidence, that Debtor knowingly made materially false oaths

and statements in his bankruptcy papers with the intent to deceive.

# IV. CONCLUSION

First, Debtor manifested his overall scheme through his attempts to hide or redirect assets and income to prevent collection of income taxes and the debt owed to the United States and his other creditors. I will therefore enter an Order denying Debtor's discharge.

Second, Debtor's failure to create and maintain sufficient financial records to permit a reasoned investigation of his financial history violates Section 727(a)(3) of the Bankruptcy Code. I will therefore enter an Order denying Debtor's discharge.

Third, Debtor's attempts to detour and subvert his assets and income to prevent, hinder, and delay his creditors from collecting their debts and, in particular, to prevent, hinder, and delay the United States from garnishing on its judgments against him, violates Section 727(a)(2)(A) of the Bankruptcy Code. I will therefore enter an Order denying Debtor's discharge.

Fourth, Debtor's false oaths and false accountings in his bankruptcy papers (the Schedule and SOFA) violate Section 727(a)(4) of the Bankruptcy Code. I will therefore enter an Order denying Debtor's discharge.

Fifth, Debtor's entire bankruptcy filing was undertaken to circumvent the decision and analysis of District Court Judge Patrese B. Tucker and to frustrate

-39-

her orders requiring that Debtor's compensation be garnished to start to repay his substantial educational debts. I will therefore enter an Order denying Debtor's discharge.

This Memorandum Opinion includes my findings of fact, conclusions of law, and my discussion of this adversary proceeding. On the basis of all of the above, I find upon a preponderance of the evidence for Plaintiff, United States, and against Defendant, Debtor, and will enter judgment in favor of Plaintiff and against Defendant through the Order of even date herewith.

Date: January 5, 2012

BY THE COURT

Richard E. Fehling, U.S.B.J.